

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN FLEMING,

       Petitioner,

v.

DAVID GUNDY,

       Respondent.

_____/

CASE NO. 04-CV-72365-DT
HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT JUDGE
HONORABLE R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Douglas Baker
Attorney at Law
3300 Penobscot
645 Griswold
Detroit, MI 48226

MICHAEL A. COX
ATTORNEY GENERAL

Raina I. Korbakis (P49467)
Assistant Attorney General
Attorney for Respondent
Criminal Appellate Division
P.O. Box 30217
Lansing, MI 48909
(517) 373-4875

## Respondent's Answer in Opposition to Petition for Writ of Habeas Corpus

### Relevant Facts and Procedural History

Petitioner's convictions stem from the October 1999 shooting death of 36-year-old Scott

York, whose body was found by hunter in a remote wooded area of Arenac County. York was

shot twice, once in the face and once when he was lying on the ground, in the back of his head.

The shotgun used to kill York was wrapped in plastic and found in a creek near Petitioner's

home; it was found while a search of Petitioner's home was being conducted. Prior to the

weapon being found, Petitioner denied killing York. After the weapon was found, Petitioner

confessed several times to the killing. The defense theory was that Petitioner shot York in self-defense.

Prior to trial, defense counsel filed a Motion for *Walker* Hearing which stated:

Now comes the Defendant, Stephen Fleming, by and through his attorneys, Dewey & Schultz, and moves that this Honorable Court enter an order suppressing statements of the Defendant allegedly obtained by the police in this matter, for the reason that they were obtained involuntarily.

A *Walker* hearing was held on April 17, 2000. (*Walker* Hearing Transcript [H] dated 4-17-00) The *Walker* hearing transcript reveals that the police obtained a warrant to search Petitioner's home and, on November 19, 1999, they executed it. (H, 4-5) At approximately 11:43 p.m. on November 19, 1999, Detective Robert Lesneski and several colleagues arrived at Petitioner's home to conduct the search. Petitioner was cooperative and even told Lesneski that he would find drugs in his barn. (H, 5-6) Approximately an hour later, after finding the drugs, Lesneski approached Petitioner, told him he needed to talk to him, read him his *Miranda* rights, and asked if Petitioner would be willing to speak with him; Petitioner responded—something to the effect of—not if you want to ask me questions about that fucking homicide or homosexual activity. (H, 7-8, 25, 30, 33-34) Lesneski did not question or interrogate Petitioner about the murder after Petitioner made this statement. (H, 43)

At approximately 1:00 or 1:30, Petitioner was arrested for the drugs and placed in the back of a police car, while the search of his property continued. (H, 7-8, 35) The search of Petitioner's residence took several hours because it was a big place and Lesneski did not have the resources to take Petitioner to the jail. (H, 40) When the search was finished, Lesneski intended to take Petitioner to the jail. It was not unusual that Petitioner was kept on the scene during the execution of the search warrant. (H, 36-37, 42)

2

At approximately 2:30 p.m., the murder weapon was found in a creek behind Petitioner's farm. (H, 8-9, 39) The search team was excited that the weapon had been found and Petitioner, in a van at this point, likely saw this excitement. (H, 11-12) Petitioner was on the passenger side of Sergeant Clayton's van and Clayton was behind the driver's wheel. (H, 10) Approximately 15 minutes after Lesneski arrived back to Petitioner's residence after finding the weapon, Clayton told Lesneski that Petitioner wanted to talk to him. (H, 11) Lesneski did not run right out to the van, but got there within 5 minutes; he then excused Clayton and sat in the van with Petitioner. (H, 12)

Lesneski did not ask Petitioner any questions at all and did not begin an interrogation. Petitioner asked him if they've got the gun and Lesneski replied yes. Petitioner stated he couldn't believe they found that fucking gun, said he shouldn't have thrown in there, and told Lesneski he was "one hell of a man" and that he (Petitioner) knew he was "out-classed." Petitioner cried, asked Lesneski to pull the van away so other officers wouldn't see him crying. When Petitioner asked Lesneski to open a window, Lesneski did. Petitioner also told Lesneski about how he knew he was in trouble after getting a penny (as change from a purchase Petitioner made) with a cross on it, and how Petitioner was concerned about Lesneski's safety while Lesneski searched the silo on Petitioner's property. Lesneski said nothing to Petitioner—he just let Petitioner speak. Subsequent to Petitioner's story about the penny, Lesneski read Petitioner his *Miranda* rights again, Petitioner understood them and then proceeded to give Lesneski new information and confirmed that he shot and killed York. (H, 13-21) Petitioner's conversation with Lesneski took place at approximately 3:00 p.m. or shortly thereafter on November 19, 1999. (H, 39) Approximately an hour later, Lesneski took a recorded statement from Petitioner at the police station after reading *Miranda* warnings to Petitioner once again. (H, 21) At no time on

3

November 19, 1999, did Petitioner appear to be intoxicated, unaware, or tired, and Lesneski
made no threats or promises in order to get Petitioner to confess. (H, 22-23) Petitioner was
given *Miranda* warnings three times on November 19, 1999.

Petitioner called Detective Robert Clayton at the *Walker* hearing. Clayton was called to
Petitioner's residence in reference to the hashish lab that State police found there. Clayton was
asked to sit with Petitioner, which he did. They were together for approximately an hour and
engaged in small talk. At one point, Clayton surmised that the weapon had been found; being in
front of the van, Petitioner would have seen the officers' excitement when Clayton saw it.
Petitioner made an utterance to Clayton, something about his head or heart having just gone to
the moon. At one point, Clayton indicated that maybe he (Petitioner) might want to do the right
thing; Petitioner responded affirmatively. It is not clear whether this was in response to a
question or comment from Petitioner. Clayton did not use the phrase "to get with the program."
Between one and five minutes later, Clayton asked Petitioner if he wanted to speak to Lesneski
and Petitioner responded affirmatively. Nothing else was said between the "do the right thing"
comment and the time when Petitioner was asked if he wanted to talk to Lesneski. Petitioner
never told Clayton he was about to vomit or ever vomited, and showed no signs of being sick.
(H, 45-52)

Petitioner testified that he sat with Clayton for about an hour in the STING narcotic van
and that they engaged in small talk. At one point, Petitioner said Lesneski pulled up and made a
gesture of excitement with his fist. According to Petitioner, Clayton then said he wasn't sure
what was going on, but "If I were you, I would get with the program." Clayton also asked
Petitioner if he wanted to talk to (Lesneski), and Petitioner responded "Yeah, I think that would
probably be the right thing." Clayton then told Lesneski that Petitioner wanted to have a

4

conversation with him, and Lesneski came within a few minutes and Clayton left. Petitioner alleged that he was upset and nervous and that police officers had some unkind looks on their faces. (H, 52-59)

On cross-examination, Petitioner acknowledged having had prior dealings with police and Lesneski before this incident about other, unrelated criminal activity. November 19, 1999 was not his first dealing with police or police investigations. Petitioner could read, write, and understand English, and Petitioner knew the importance of the *Walker* hearing with respect to his chances of prevailing at trial. Petitioner was not harmed or abused by police on November 19, 1999 and did not vomit in the presence of any police officer. In fact, Petitioner acknowledged that Lesneski and Clayton were cooperative. Petitioner began to feel "real uncomfortable" after he saw police officers staring at him. Petitioner claims he did not conclude that they found the murder weapon—he just believed it wasn't a good sign. Petitioner did not think he was going to be beaten, molested, or physically harmed by these police officers.

Petitioner alleged that his statement to Clayton, that his "heart just went to the moon," was made in reference to him being startled when Lesneski pulled up next to the van. Sometime after this statement, Clayton made the "maybe you should get with the program" comment and that he (Petitioner) "may want to talk to Detective Lesneski" because he (Clayton) believed they had found something or that there were definitely some more circumstances involved. (H, 64-65)

Petitioner stated that when he talked to Lesneski, Lesneski said he found a weapon, that it would be in his (Petitioner's) best interest to cooperate. (H, 59-69)

Following the *Walker* hearing, the trial court judge concluded that he didn't believe Clayton's statements to Petitioner "rise to the burden of repeated questioning with the intent to wear down." The trial court also deemed Petitioner's statement(s) voluntary under *Edwards*,

5

*Mosley*, and *Katey* [sic: *Catey*].  The trial court noted that Petitioner was given *Miranda*
warnings four times over the course of 10 days[1] and concluded that the statements were
voluntary and admissible.  (II, 73-76)

Petitioner was charged with open murder.  Following a jury trial, Petitioner was
convicted of second-degree murder and felony firearm.[2]  In July of 2000, Petitioner was
sentenced to life in prison for the murder conviction and to 2 years' imprisonment for felony
firearm.

In July of 2000, Petitioner filed his claim of appeal in the Michigan Court of Appeals and
raised the following claims through his attorney:

I.      Because the police did not "scrupulously honor" [Petitioner's] assertion of his
        Miranda rights, but instead pressured him to confess, the trial court reversibly
        erred in denying the defense motion to suppress.

II.     Where [Petitioner] admitted killing Scott York but claimed self-defense, the trial
        court deprived him of his right to present a defense by forbidding him from
        calling a witness who had seen York "rip off" a drug dealer, and who thus would
        have provided crucial corroboration for [Petitioner's] own testimony that he
        feared York because York had spoken ominously of robbing drug dealers.

On May 14, 2002, the Michigan Court of Appeals issued an unpublished per curiam opinion

affirming Petitioner's convictions.  On June 20, 2002, the Michigan Court of Appeals issued an

order denying Petitioner's motion for rehearing.  (*People v. Fleming*, Michigan Court of Appeals

No. 228731)

---

[1] Petitioner was given *Miranda* warnings three times on November 19, 1999: once by Lesneski at
approximately 12:43 p.m.; later in the van by Lesneski after Petitioner told Lesneski the story
about the penny in Petitioner's pocket; and later before Petitioner's statements are tape recorded
at the police station.
[2] Respondent also adopts the facts as set forth by assistant attorney general J. Ronald Kaplansky
in his brief on appeal to the Michigan Court of Appeals.  Additional facts will be provided as
needed.  Respondent objects to Petitioner's statement of the facts to the extent that the statements
are not supported by the record.

6

In August of 2002, Petitioner filed a delayed application for leave to appeal in the

Michigan Supreme Court and raised the following claims:

I.      Because the police did not "scrupulously honor" [Petitioner's] assertion of
        his Miranda rights, but instead pressured him to confess, the trial court
        reversibly erred in denying the defense motion to suppress.

        A. The issue is fully preserved for review.

        B. The police violated [Petitioner's] Fifth Amendment right to silence by
        encouraging him to change his mind and speak.

II.     Where [Petitioner] admitted killing Scott York but claimed self-defense,
        the trial court deprived him of his right to present a defense by forbidding
        him from calling a witness who had seen York "rip off" a drug dealer, and
        who thus would have provided crucial corroboration for [Petitioner's] own
        testimony that he feared York because York had spoken ominously of
        robbing drug dealers.

On March 31, 2003, the Michigan Supreme Court issued an order denying Petitioner's delayed

application for leave to appeal because it was not persuaded that the questions presented should

be reviewed. (*People v. Fleming*, Michigan Supreme Court No. 122167)

Petitioner, through counsel, has now commenced this habeas, pursuant to 28 U.S.C. §

2254, by filing a habeas petition and supporting brief. Petitioner raises the following claims in

his brief:

        I.  The Michigan Court of Appeals' ruling that the police "scrupulously
            honored" [Petitioner's] assertion of his Fifth Amendment right against
            self-incrimination was an unreasonable application of *Michigan v. Mosley*.

            A. The issue was not procedurally defaulted.

            B. The police did not "scrupulously honor" [Petitioner's] assertion of
            his Fifth Amendment right to silence when they advised him to
            "get with the program," "do the right thing," and submit to their
            questioning.

II.  The trial judge deprived [Petitioner] of his Sixth and Fourteenth
Amendment right to present a defense by forbidding him from calling
the only witness who could corroborate any aspect of his account of
the events that immediately preceded the killing.

Respondent now answers the petition and requests that it be denied for the reasons stated

in the argument section below. In addition, Respondent asserts any and all available defenses

including failure to exhaust state court remedies, the statute of limitations, and procedural default

for each claim to which it is applicable. To the extent that any of the alleged trial errors are

meritorious, Respondent asserts that they did not have a substantial impact or influence on the

outcome of Petitioner's trial.

## Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) altered the

standard of review that federal courts must apply when reviewing applications for a writ of

habeas corpus. The AEDPA applies to all habeas petitioner filed after the effective date of the

act, April 24, 1996. Because Petitioner's application was field after April 24, 1996, the

provisions of the AEDPA, including the amended standard , apply to this case.

As amended, 28 U.S.C. §. 2254(d) imposes the following standard or review that a

federal court must utilize when reviewing applications for a writ of habeas corpus:

(d)  An application for a writ of habeas corpus on behalf of a person in
custody pursuant to the judgment of a State court shall not be granted with respect
to any claim that was adjudicated on the merits in State court proceedings unless
the adjudication of the claim-

(1)  resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the Untied States, or

8

> (2)  resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

Under 28 U.S.C. § 2254(d)(1), the writ may issue only if one of two conditions is
satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly
established Federal law, as determined by the Supreme Court of the United States," or (2)
"involved an unreasonable application . . . of clearly established Federal law, as determined by
the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court
may grant the writ if the state court arrives at a conclusion opposite to that reached by the
Supreme Court on a question of law or if the state court decides a case differently than the
Supreme Court has on a set of materially indistinguishable facts. Under the "unreasonable
application" clause, a federal habeas court may grant the writ if the state court identifies the
correct governing principle from the Supreme Court's decision but unreasonably applies that
principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362 (2000),

> [I]n § 2254(d)(1), Congress specifically used the word "unreasonable," and not a
> term like "erroneous" or "incorrect." Under § 2254(d)(2)'s "unreasonable
> application" clause, then, a federal habeas court may not issue the writ simply
> because the court concludes in its independent judgment that the relevant state-
> court decision applied clearly established law erroneously or incorrectly. Rather,
> that application must also be unreasonable. *Id.*

Even prior to the enactment of the AEDPA, the Supreme, this Court stated that a "federal
habeas court, should, of course, give great weight to the considered conclusions of a coequal
state judiciary." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). The Supreme Court has recently
again warned the federal courts against too readily granting habeas relief simply because it
disagrees with the state court's decision. In *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), the
Supreme Court stated: "A federal court's collateral review of a state-court decision must be

9

consistent with the respect due state courts in our federal system." In *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002), the Supreme Court stated 28 U.S.C. § 2254(d) imposes a highly deferential standard for evaluating state court rulings on habeas review, and "demands that state court decisions be given the benefit of the doubt." The Supreme Court further stated that a "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Woodford*, 537 U.S. at 24.

**Argument I**

**Petitioner's first habeas claim is either procedurally defaulted and/or without merit.**

In his habeas action, Petitioner argues that the state court rulings that the police "scrupulously honored" Petitioner's assertion of his Fifth Amendment right against self-incrimination was an unreasonable application of *Michigan v. Mosley*, 423 U.S. 96 ((1975). Petitioner alleges that the Michigan Court of Appeals erred in determining the issue was procedurally defaulted and that the police did not "scrupulously honor" Petitioner's assertion of his right to silence.

As noted above, prior to trial Petitioner filed a motion for *Walker* hearing in which he requested the trial court to enter an order "suppressing statements of the Defendant allegedly obtained by the police in this matter, for the reason that they were obtained involuntarily." On April 17, 2000, a *Walker* hearing was held; the trial court denied Petitioner's motion. Petitioner challenged the trial court's admission of his confessions in his direct appeal but the Michigan Court of Appeals rejected his arguments:

> Defendant contends that the trial court erred in denying the motion to suppress his inculpatory statements because the officers did not "scrupulously honor" his previously exercised right to remain silent. As an initial matter, we note that defendant's *Walker*[1] hearing addressed only the voluntariness of his confession. Therefore, this issue is forfeited. Nevertheless, defendant may avoid forfeiture of this issue under the plain error rule, by establishing that: (1) error occurred, (2) the error was plain, i.e. clear or obvious, and (3) the plain error affected substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Generally, the third requirement requires a showing of prejudice that the error affected the outcome of the lower court proceedings. *Id.* Even if the defendant satisfies these three requirements, an appellate court must then exercise its discretion in deciding whether to reverse. *Id.* Reversal is warranted only "when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error `seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.*

at 763-764, quoting *United States v Olano*; 507 US 725, 736-737;113 S Ct 1770; 123 L, Ed 2d 508 (1993)

Generally, *Miranda* warnings are procedural safeguards required to protect a defendant's right against self-incrimination from the inherently compelling nature of custodial interrogation. *Miranda v Arizona*, 384 US 436, 444, 467; 86 S Ct 1602;16 L Ed 2d 694 (1966). Once a person invokes the right to remain silent, interrogation must stop. *Id.* at 473-474, 478-479. Whether statements made after a person has decided to remain silent are admissible depends on whether the right to stop questioning was "scrupulously honored." *Michigan v Mosley*, 423 US 96, 104; 96 S Ct 321; 46 L Ed 2d 313 (1975). To scrupulously honor a person's right to remain silent, the subsequent interrogation must not "have the characteristics of a repeated effort to wear down the resistance of the defendant and make him change his mind." *People v Catey*,135 Mich App 714, 725; 356 NW2d 241 (1984).

In the instant matter, defendant testified at the *Walker* hearing that he told the lead investigating officer that he did not want to talk about "the homicide." An argument could be made that this statement fell short of an unequivocal assertion of his right to remain silent. See *People v Adams*, 245 Mich App 226, 233-235; 627 NW2d 623 (2001). For example, while executing the search warrant, the police discovered evidence of drug possession. Defendant's statement to the lead investigating officer was certainly not broad enough to prohibit the police from questioning him regarding issues relevant to his drug possession. See *id.*

Even assuming that defendant sufficiently invoked his right to remain silent, we are not persuaded that the police officers failed to "scrupulously honor" this exercise of his rights. Here, other than "small talk," the only comments made by the police officers to defendant followed their discovery of the gun used to commit the instant offense. Accepting defendant's version of the events, these comments were: (i) a mild admonition to "do the right thing" or "get with the program"; and (ii) an inquiry as to whether defendant now wished to talk to the lead investigating officer. As to (i), given defendant's repeated denials of involvement in the instant offense, as well as his general familiarity with the justice system, we are not convinced that these comments were "reasonably likely to elicit an incriminating response," as necessary to be [sic] constitute "interrogation." *People v Kowalski*, 230 Mich App 464, 479; 584 NW2d 613 (1998), quoting *Rhode Island v Innis*, 446 US 291, 301; 100 S Ct 1682; 64 L Ed 2d 297 (1980). In regard to (ii), we have also recognized that it is appropriate to present new information to an individual so that "an informed and intelligent assessment" of his or her options may be made. *Kowalski, supra* at 475-476, quoting *Mosley, supra* at 102. Again, in the instant matter, the police comments were prompted by the discovery of inculpatory evidence, thereby allowing defendant to make an informed and intelligent re-assessment of his options. Ultimately, we do not believe that these comments were of sufficient quality or

quantity to constitute "a repeated effort to wear down the resistance of the
defendant and make him change his mind." *Catey, supra* at 725. Thus, we are
not persuaded that the police failed to "scrupulously honor" defendant's right to
remain silent. *Id.* Therefore, we conclude that the admission of defendant's
statements was not plainly erroneous, and that defendant may not avoid forfeiture
of this issue. *Carines, supra* at 763. [*People v. Fleming*, unpublished per curiam
opinion, pp 1-2, Michigan Court of Appeals No. 228731]

---

[1]  *People v Walker*, 374 Mich 331;132 NW2d 87 (1965).

[2]  We further note that there is an evidentiary basis to support the trial court's finding that
defendant was *Mirandized* four times on the day that he made the relevant statements.
Although this fact is certainly not dispositive to our resolution of this issue, it does,
however, support our conclusion that the police were not attempting to wear down
defendant's resistance to questioning.

As an initial matter, it appears that Petitioner's habeas claim is procedurally defaulted.
The Michigan Court of Appeals found Petitioner's claim procedurally defaulted and, to the extent
that Petitioner argues this finding was improper under State law, this claim is not cognizable
upon federal habeas review.

Petitioner claims the Michigan Court of Appeals' preservation ruling is not an "adequate"
state ground for denying him review and therefore does not preclude federal review. Petitioner
cites to a footnote in one case, *People v. Whitehead*, 238 Mich App 1, 8, n5 (1999) to support his
claim that "the stringent preservation requirement the Court [of Appeals] applied here is not one
the Michigan courts regularly follow."

To be adequate, a state procedural rule must be "'firmly established and regularly
followed' by the time as of which it is to be applied." *Ford v. Georgia*, 498 U.S. 411, 424
(1991). To determine whether a rule is firmly established, a court should look to whether, at the
time of the petitioner's actions giving rise to the default, the petitioner "could not be deemed to
have been apprised of [the rule's] existence." *Ford*, 498 U.S. at 423 (quotation and citation
omitted). A petitioner must show more than "an occasional act of grace by a state court in

excusing or disregarding a state procedural rule" in order for a federal court to conclude that the state procedural rule is inadequate because inconsistently applied. *Hutchinson v. Bell*, 303 F.3d 720, 737 (6th Cir. 2002), citing *Coleman v. Mitchell*, 268 F.3d 417, 429 (6th Cir. 2001) (quotation and citation omitted); *see also Dugger v. Adams*, 489 U.S. 401, 410 n.6 (1989). *Scott v. Mitchell*, 209 F.3d 854, 869-870 (6th Cir. 2000)(Isolated examples in which a state court relaxed its enforcement of contemporaneous objection rule and other procedural default rules were insufficient to establish that contemporaneous objection rule was inadequate to constitute procedural default.) In this case, by citing to one footnote in one case, Petitioner has not established that the Michigan Court of Appeals' basis for finding that he forfeited his claim about his inculpatory statements was not firmly established and regularly followed.[3]

A federal habeas petitioner who fails to comply with a state's procedural rules waives his right to federal habeas review absent a showing of cause for noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation. *Gravely v. Mills*, 87 F.3d 779, 784-785 (6th Cir. 1996). Because Petitioner has failed to allege or establish cause to excuse his procedural default, or a fundamental miscarriage of justice, review of his claim should be barred.

In the event that this Court finds that Petitioner's claim is not procedurally defaulted and that the trial court ruled on the claim, the claim is without merit.

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To achieve this objective, the Supreme Court devised a mandatory procedure—the *Miranda* warnings—for law enforcement

---

[3] Also, in note 5 of *Whitehead,* the Michigan Court of Appeals states that: "Ordinarily the request for a *Walker* hearing would preserve only arguments regarding the voluntariness of the confession" and that "even if defendant's arguments regarding his confession are properly considered, in part, to be unpreserved, . . . " *Whitehead*, 238 Mich App 1, 8, n5.

14

officers to follow before interrogating a suspect in custody. The suspect must be informed prior
to any questioning that he "has a right to remain silent, that any statement he does make may be
used as evidence against him, and that he has a right to the presence of an attorney, either
retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings are
constitutionally required in order to combat the "'compelling pressures' inherent in custodial
police interrogation . . . and to permit a full opportunity to exercise the privilege against self-
incrimination" guaranteed by the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428,
440 (2000) (quoting *Miranda*, 384 U.S. at 467). According to *Miranda*, "the accused must be
adequately and effectively apprised of his rights and the exercise of those rights must be fully
honored." *Miranda*, 384 U.S. at 467.

Once warnings have been given, if the individual indicates in any manner, at any time
prior to or during questioning, that he wishes to remain silent, the interrogation must cease.[4]
*McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir. 2001) (quoting *Miranda*, 384 U.S. at 473-474).
In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court said that "interrogation"
consisted of "any words or actions on the part of the police (other than those normally attendant
to arrest and custody) that the police should know are reasonably likely to elicit an incriminating
response from the suspect." *Innis*, 446 U.S. at 301. In *Mosley*, 423 at 104 (1975), the Supreme
Court held "the admissibility of statements obtained after the person in custody has decided to
remain silent depends under *Miranda* on whether his 'right to cut off questioning' was
'scrupulously honored.'" Recently, the Sixth Circuit Court of Appeals held that:

> Under *Mosley*, a court considers several factors when assessing whether
> officers scrupulously honored a suspect's invocation of his right to remain silent.
> 423 U.S. at 96. The first factor . . . is whether the suspect was advised before the

---

[4] The invocation of the right to silence merely requires the cessation of "interrogation;" it does
not bar the police from engaging in other forms of investigation or gathering evidence.

15

initial interrogation that he had the right to remain silent. . . . The second factor is whether questioning stopped immediately once the petitioner asserted his right to remain silent. . . .

The third factor is whether the police waited a significant period of time after the petitioner's invocation of his right to remain silent before questioning him again. A significant period of time between interrogations does not require a durational minimum. *Compare United States v. Cody,* 114 F.3d 772, 775-76 (8th Cir.1997) (three hours was significant amount of time) *with United States v. Barone,* 968 F.2d 1378, 1385 (1st Cir.1992) (more than twenty-four hours was insufficient where police repeatedly pressured suspect to cooperate). . . .

A "significant period of time" under *Mosley* is a function of the degree to the police "persiste[d] in repeated efforts to wear down [the suspect's] resistance and make him change his mind." 423 U.S. at 105-06. . . .

The fourth *Mosley* factor is whether the petitioner received fresh *Miranda* warnings before the interview leading to his statement. . . .

The final *Mosley* factor is whether the final interrogation concerned a crime that was the subject of the first interrogation, as it did here. Where other factors indicate that a defendant's right to cut off questioning was "scrupulously honored," the mere fact that an interrogation involves the same crime as earlier interrogations does not automatically require exclusion of the petitioner's statement. *See, e.g., Weeks v. Angelone,* 176 F.3d 249, 268 (4th Cir. 1999) (pertinent inquiry is not the subject of the later interview, but whether officers sought to undermine the suspect's desire to remain silent); *Hatley v. Lockhart,* 990 F.2d 1070, 1074 (8th Cir. 1993) ("[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview."); *United States v. Hsu,* 852 F.2d 407, 410 (9th Cir. 1988) ("an identity of subject matter in the first and second interrogations is not sufficient, in and of itself, to render the second interrogation unconstitutional"). [*Davie v. Mitchell,* 291 F.Supp.2d 573, 597-599 (6th Cir. 2003)].

In this case, Petitioner was given *Miranda* warnings at approximately 12:43 p.m. on

November 19, 1999. Assuming that he sufficiently invoked his right to remain silent at that

point, the police officers did not fail to "scrupulously honor" the exercise of his right.

Petitioner was *Mirandized,* consistent with the first factor above. Questioning stopped

immediately once Petitioner asserted his right to remain silent, consistent with the second factor

above. A significant period of time passed after Petitioner's invocation of his right to remain

16

silent and before Clayton's comments were made: the *Walker* hearing transcript appears to reveal that nearly two hours had passed between the time Petitioner invoked his right to remain silent and the time the weapon was found. Although Petitioner may not have received fresh *Miranda* warnings before Clayton's comments were made, Clayton's comments, even accepting Petitioner's version of the events, were not reasonably likely to elicit an incriminating response, as necessary to constitute an "interrogation." The *Walker* hearing transcript does not reveal whether Clayton's comments to "do the right thing" or "get with the program" (assuming he even made the latter comment) were made in response to a question or inquiry from Petitioner. Even assuming they were not, however, the comments, as well as the mere inquiry whether Petitioner wanted to speak to Lesneski, were hardly of a sufficient quality or quantity to constitute repeated efforts to wear down Petitioner's resistance and make him change his mind. There is no evidence that Clayton had undertaken to wear Petitioner down, that he attempted to badger Petitioner or cajole him into talking with him or Lesneski, that he withheld anything from Petitioner that Petitioner may have requested (such as food or water), or that he threatened or promised Petitioner something for his confession. There is also no evidence that the police in this case strategically "planned" to place Petitioner in the van under observation after his arrest, "planned" to find the murder weapon in a creek behind Petitioner's home, and "planned" to "exult" in Petitioner's presence in order to elicit an incriminating response from him. Moreover, when Lesneski returned to the van, he did not interrogate Petitioner.

Petitioner states that while it is entirely appropriate for the police to present new information to the suspect so that he has an opportunity to make an informed and intelligent assessment of his interests, they must not extract his waiver by resort to the same compelling influence of the interrogation process. (Petitioner's brief, p 19) In this case, Clayton's

comment(s), whether made in response to a question by Petitioner or not, were prompted by the discovery of inculpatory evidence, thereby allowing Petitioner to make an informed and intelligent re-assessment of his options. Neither Clayton's comment nor question to Petitioner contained a compulsive element; this was hardly the "interrogation" Petitioner alleges. Petitioner also has not established that Lesneski "extracted" a confession from him.

The state adjudications of this matter did not result in an objectively unreasonable application of the standard established by Supreme Court law. The Michigan Court of Appeals' conclusion that the police did not fail to "scrupulously honor" Petitioner's right to remain silent is persuasive and reasonable. A fair reading of the Michigan Court of Appeals' opinion reveals that it applied the appropriate constitutional test, and that it applied it to the facts of Petitioner's case in an ordinary fashion to reach a reasoned decision. Whether another court would have reached a different conclusion, the appellate court's decision here was at least objectively reasonable.

Because the state court adjudications were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or an unreasonable determination of the facts, Petitioner should be denied habeas relief.

**Argument II**

**Petitioner is not entitled to habeas relief on his second habeas claim because
the claim is either not cognizable or without merit.**

In his second habeas claim, Petitioner alleges that the trial judge deprived him of his right

to present a defense by forbidding him from calling Scott Fowler; Fowler's proposed testimony is

at pages 451-458 of the trial transcript dated 5-18-00.[5]

In his direct appeal, Petitioner argued that the trial court erred by refusing to admit

Fowler's testimony but the Michigan Court of Appeals rejected it:

> Defendant also contends that the trial court abused its discretion by not
> allowing a witness to testify that the victim had "ripped off" drug dealers
> approximately one week before the victim was murdered. Defendant asserts that
> this testimony would have corroborated his claims he was afraid of the victim and
> shot the victim in self-defense. Initially, we note that, contrary to defendant's
> claims, this issue is not a constitutional issue because defendant was allowed to
> present his self-defense claim at trial. Indeed, defendant had already testified
> when the instant evidentiary dispute arose. Instead, this is an evidentiary issue
> that is within the trial court's discretion and, therefore, reviewed for abuse of
> discretion. *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998).

> Generally, all relevant evidence is admissible. MRE 402; *People v Starr*,
> 457 Mich 490, 497; 577 NW2d 673 (1998). Relevant evidence is evidence that is
> material and probative, meaning the evidence is logically relevant to, and has any
> tendency to prove, an issue or fact of consequence at trial. MRE 401; *Starr, supra*
> at 497-498.

> To assert a self-defense claim, a defendant must honestly and reasonably
> believe there is an imminent danger of serious bodily harm or death. *People v
> Heflin*, 434 Mich 482, 502; 456 NW2d 10 (1990). If evidence is used to show the
> defendant's state of mind and support his apprehensions, the defendant must have
> known of the evidence. *People v Harris*, 458 Mich 310, 317; 583 NW2d 680

---

[5] After Petitioner testified at trial, the defense desired to introduce the testimony of Scott Fowler.
A separate record was made as the prosecutor objected to Fowler's testimony. Fowler testified
that about a week before the victim's death, Fowler and the victim went to Saginaw to purchase
crack. Fowler testified that the victim paid for the cocaine, got into a "little bit" of a physical
confrontation with the sellers, jumped into Fowler's vehicle, and said "get the fuck out of here
now." Fowler said he was scared and asked the victim to explain; Fowler testified that the victim
told him he had ripped the sellers off for some money.

(1998). Here, defendant's knowledge of the victim's alleged theft from drug dealers was based on the victim's statements, not the witness's statements. In fact, defendant testified that, at the time of the incident, he did not know anything about the victim's propensity for violence. In other words, to whatever extent defendant had knowledge of the victim's prior conduct, it was not based whatsoever on the excluded evidence. Accordingly, we fail to see how the proposed testimony was relevant to defendant's specific assertion of self-defense.

Further, even where character evidence of a homicide victim is admissible pursuant to MRE 404(a)(2), MRE 405(a) limits the introduction of this evidence on direct examination to "testimony as to reputation or by testimony in the form of an opinion." It is only during cross-examination that the inquiry may delve into specific acts. MRE 405(a). Thus, even if the proposed witness had been allowed to testify, his testimony on direct examination could not have referenced the victim's alleged robbing of crack dealers. In fact, defendant did properly present the testimony of two witnesses suggesting that the victim had a reputation for violence. Under MRE 405(a), this is the proper method of establishing a character trait or propensity, such as violence. Consequently, we are not persuaded that the trial court abused its discretion by excluding the proposed testimony. [*People v. Fleming*, unpublished per curiam opinion, pp 3-4, Michigan Court of Appeals No. 228731]

---

[3] In addition, we would note that defendant's testimony was damaging to his claim of self-defense, defense, suggesting that, even if the proposed testimony was erroneously excluded, the error was harmless. For example, defendant testified that he had an opportunity to drive "probably sixty yards" away from the victim, before turning around to attempt to pacify the victim. Moreover, defendant testimony's established that the victim approached him menacingly at a "steady walk"; however, defendant testified that he had sufficient time to retrieve the shotgun from his truck, load the shotgun with bullets that were in his pocket, and then warn the victim to stop at least twice before shooting him. Although defendant claimed that the shooting was "self-defense," he testified that he shot the victim twice. Further, defendant testified that the victim was not armed with any weapons as he approached defendant; nevertheless, defendant testified that he shot the victim in the face and head. In light of defendant's testimony, we believe that there was an ample basis for the jury to conclude that defendant's use of deadly force was unreasonable, regardless of the victim's history of robbing crack dealers or defendant's honest belief that those stories were true.

A review of Petitioner's claim made to the trial court, state appellate courts, and this

Court reveals that the claim is essentially one involving an evidentiary issue, as the Michigan

Court of Appeals correctly concluded. To the extent that Petitioner alleges the trial court

misinterpreted or mischaracterized state law, or that the state adjudications violated the Michigan

Constitution, Michigan case law or statute, or the Michigan Rules of Evidence, such claims are

not cognizable upon federal habeas review.  A federal habeas court may only grant habeas relief

to a petitioner "in custody in violation of the Constitution or laws or treaties of the United

States,"  28 U.S.C. 2241(c)(3); 28 U.S.C. 2254(a), and habeas relief may not be based upon

perceived error of state law.  *Gilmore v. Taylor*, 508 U.S. 333 (1993); *Estelle v. McGuire*, 502

U.S. 62 (1991); *Lewis v. Jeffers*, 497 U.S. 764 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982).

To the extent that Petitioner argues his federal constitutional right to present a defense

was violated and to the extent that this Court considers this claim, the claim is without merit.

Petitioner is clearly correct in asserting that he has a federal constitutional right to present

a defense.  The right to present a defense is not an unlimited right to present evidence without

regard to reasonable evidentiary restrictions.  On the contrary, the Supreme Court has explicitly

recognized that "[a] defendant's interest in presenting . . . evidence may [have to] bow to

accommodate other legitimate interests in the criminal trial process," *United States v. Scheffer*,

523 U.S. 303, 308 (1998), and a defendant in a criminal case "does not have an unfettered right

to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules

of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  Rather, he "must comply with

established rules of procedure and evidence designed to assure both fairness and reliability in the

ascertainment of guilt and innocence."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  As

the Supreme Court explained in *Scheffer*:

> state and federal rulemakers have broad latitude under the Constitution to
> establish rules excluding evidence from criminal trials.  Such rules do not
> abridge an accused's right to present a defense so long as they are not
> "arbitrary" or "disproportionate to the purposes they are designed to
> serve."  *Scheffer*, 523 U.S. at 308 (citations omitted).

21

The decision to not permit Fowler's testimony was not based on an arbitrary, mechanistic, or per se application of the state's evidentiary rules and it was not disproportionate to the purposes behind it. The trial court made an individual determination - after hearing Fowler's proposed testimony and based on the facts specific to Petitioner's case - that Fowler's testimony simply did not show what defense counsel said it showed, that it was irrelevant, and that any relevance was substantially outweighed by considerations of undue prejudice, confusion, or misleading the jury. The trial judge also found Fowler's testimony to be cumulative to Petitioner's testimony. (T dated 5-18-00, pp 451-458) The exclusion of Fowler's testimony was not disproportionate to the concern of the trial court that the proposed testimony was irrelevant, confusing, and misleading to the jury.

The Constitution does not guarantee a defendant the opportunity to present any evidence he desires; the accused, as well as the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. That Petitioner would have preferred Fowler's testimony to be admitted does not result in a violation of his constitutional rights. For reasons noted by assistant attorney general Kaplansky in his brief on appeal to the Michigan Court of Appeals, by the trial court, and by the Michigan Court of Appeals, Fowler's testimony that the victim had "ripped off" drug dealers approximately one week before the victim was murdered was properly excluded. Rather than apply an arbitrary, mechanistic, per se, or disproportionate rule that would have been contrary to clearly established Supreme Court case law, the state court in Petitioner's case weighed the value of the evidence against its potential for confusion and unreliability, and excluded it.

The excluded testimony did not violate Petitioner's right to present a defense. Petitioner was permitted to present a self-defense claim at trial, argued his theory that the victim was

22

suicidal, and properly presented the testimony of two witnesses suggesting that the victim had a reputation for violence.

Even if Fowler's proposed testimony was erroneously excluded, which Respondent does not concede, any such error was harmless.

The standard for showing harmless error on collateral review, like the standard for demonstrating that a trial error has occurred, is considerably less favorable to the petitioner than the standard applicable on direct review. On direct review, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," and the state has the burden of proof. *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000), quoting *Chapman v. California*, 386 U.S. 18, 24 (1967). The test on collateral review is different. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); see also *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995) (habeas court should grant petition if it has "grave doubt" about whether trial error had substantial and injurious effect or influence upon jury's verdict).

Inquiry into the harmlessness of the alleged constitutional error in this case is whether, in light of the record as a whole, the exclusion of Fowler's proposed testimony had a substantial and injurious effect or influence in determining the jury's verdict.

For reasons noted by the Michigan Court of Appeals in footnote 3 regarding the damaging nature of Petitioner's own testimony to his claim of self-defense, as well as for reasons noted by assistant attorney general Kaplansky in his brief on appeal to the Michigan Court of Appeals, there was an ample basis for the jury to conclude that Petitioner's use of deadly force

was unreasonable, regardless of the victim's history of robbing crack dealers or Petitioner's

honest belief that those stories were true.  To conclude that the error was harmless in this case,

this Court need not find that the improperly admitted evidence had no effect at all, see *United

States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992); the Court need only find that the effect was

not substantial and injurious. *Samuels v. Mann*, 13 F.3d 522, 528 (2d Cir. 1993).  The record

supports such a finding.

Because the state court adjudications in this case were neither contrary to, nor an

unreasonable application of, clearly established Supreme Court precedent, or an unreasonable

determination of the facts, Petitioner should be denied habeas relief.

## Conclusion

For all of the foregoing reasons, Respondent respectfully requests that this Court deny

Petitioner habeas relief.  Respondent also opposes any request for discovery, evidentiary

hearings, bond, oral argument, or any other relief.


Respectfully submitted,
Michael A. Cox
Attorney General

*Janet A. VanCleve*

Raina I. Korbakis (P49467)
Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875

Dated:  November 29, 2004
2000057108C/Ans Fleming