**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**STEPHEN FLEMING,**

     **Petitioner,**

                               **Civil No: 04-CV-72365**
                               **Honorable  Arthur J. Tarnow**
                               **Magistrate Judge R. Steven Whalen**

**v.**

**LINDA M. METTRISH[1],**

     **Respondent.**
_____

**OPINION GRANTING**
**PETITION FOR WRIT OF HABEAS CORPUS**

**I.  Introduction**

     Petitioner Stephen Fleming's,  request for Habeas Corpus relief pursuant to 28 U.S.C. §2254.   Petitioner was charged with first degree premeditated murder and felony firearm. He was convicted in a jury trial of second degree murder and felony firearm .  He was sentenced to life imprisonment for the second degree murder conviction and a two year consecutive term of imprisonment for the felony firearm conviction.

     Petitioner challenges the Constitutionality of his conviction on the grounds that:

---

[1]At the time this habeas petition was filed, Petitioner was incarcerated at the Oaks Correctional Facility where David Gundy was the warden.  Petitioner is currently housed at Kinross Correctional Facility where Linda M. Metrish is the warden.

I.     **The Michigan Court of Appeals' ruling that the police "scrupulously honored" Petitioner Steven Fleming's assertion of his fifth amendment right against self-incrimination was an unreasonable application of *Michigan v Mosley*, and**

II.    **Where Stephen Fleming admitted killing Scott York but claimed self defense, the trial court deprived him of his right to present a defense by forbidding him from calling a witness who had seen York "rip off" a drug dealer, and who thus would have provided crucial corroboration for Stephen Fleming's own testimony that he feared York because York had spoken ominously of robbing drug dealers.**

Respondent asserts that Petitioner's first claim is procedurally defaulted and/or without merit. Respondent further argues that Petitioner's second claim is not cognizable on habeas review.

Upon review it is clear that the Michigan Court's decision on both grounds is an unreasonable application of clearly established federal law. Therefore, the Court grants a conditional Writ of Habeas Corpus.

## II. <u>Background</u>

Scott York, was shot and found dead on October 21, 1999 in the woods of Moffat Township. On November 2, 1999, the Petitioner's brother, Joseph Fleming, gave Detective Robert Lesneski information that Petitioner was involved in Scott York's death. Petitioner voluntarily went to the police station for the purpose of explaining his connection with Scott York. Finding that Detective Lesneski was not there, an

arrangement was made to meet at Petitioner's home at a later date. When Detective

Lesneski arrived at Petitioner's house he told Detective Lesneski that he picked up Scott

York, who was hitchhiking at the time. The two of them went to a store, purchased some

alcoholic beverages and drank together. Afterwards, Petitioner took Scott York to

Sterling, MI and dropped him off.

On November 19, 1999, Detective Lesneski obtained a search warrant for the

Petitioner's residence and surrounding curtilage, as Petitioner's land not only consisted of

his residence, but also, barns, a silo, a creek and a significant amount of land.

Upon arriving at the Petitioner's residence, Detective Lesneski informed the

Petitioner that he was looking for evidence of Scott York's murder. Detective Lesneski

read Petitioner his *Miranda* rights and asked the Petitioner if he would be willing to speak

with him. Petitioner indicated to Detective Lesneski that he did not want to talk about the

homicide or the homosexual activity.[2] Detective Lesneski told Petitioner the following:

(1) to remain in the garage; (2) he knew that the Petitioner committed the murder; (3) he

was going to prove it; and (4) the Petitioner would be punished for it.

Petitioner stated that he remained in the garage from thirty to sixty minutes until a

police unit drove into the driveway. Because drugs were found on the premises,

Petitioner was placed under arrest for possession of the narcotics. Petitioner was then

---

[2]During one of the previous meetings between Detective Lesneski and the
Petitioner, the subject arose about Scott York possibly having committed a sexual assault
upon the Petitioner when Petitioner was a child and how such an act by Scott York could
have been a motive for the Petitioner to have killed him.

placed in the back seat of the narcotics van in handcuffs, where he sat for approximately two additional hours. Officer Robert Clayton was also in the van. The two engaged in "small talk" until it appeared that the search of Petitioner's premises uncovered the gun believed to be the weapon that was used to kill Scott York. Officer Clayton told Petitioner that things did not look good for him and that it would be in his best interest to "get with the program." Officer Clayton also told Petitioner that he needed to do the right thing and asked the Petitioner if he wanted to speak with Detective Lesneski. Petitioner indicated that he wanted to speak with Detective Lesneski.

Detective Lesneski arrived at the van. Petitioner recalled that he was very nervous and upset and he was feeling very nauseous. Petitioner admitted that Detective Lesneski was very accommodating when he became aware of his physical condition by opening the door and giving him some air.

Allegedly without any questioning by Detective Lesneski, Petitioner proceeded to confess that he shot and killed Scott York with a twelve-gauge shotgun with bird-shot. When Detective Lesneski believed Petitioner completed his confession, he claims that he read Petitioner his *Miranda* rights again. Approximately one hour after Petitioner's confession, he was transported to the Arenac County Sheriff's Department, *Mirandized* again, and a recorded statement was taken.

Petitioner's theory at trial was that he killed Scott York in self-defense because he had knowledge that Mr. York robbed drug dealers. Mr. York was acting as though he

was about to rob Petitioner. He was afraid of being another one of Mr. York's victims.

Petitioner further believed that because Mr. York had been seen for psychiatric problems

in the past, was suicidal and had a reputation for being violent, that Scott York had the

propensity to cause Petitioner harm and was in a situation where he could do so.

### III.  Procedural History

Petitioner appealed his conviction as a matter of right to the Michigan Court of

Appeals and raised the following issues:

> I.  **The Michigan Court of Appeals' ruling that the
> police "scrupulously honored" Petitioner  Steven
> Fleming's assertion of his fifth amendment right
> against self-incrimination was an unreasonable
> application of *Michigan v Mosley*,  and**

> II.  **Where Stephen Fleming admitted killing Scott
> York but claimed self defense, the trial court
> deprived him of his right to present a defense by
> forbidding him from calling a witness who had seen
> York "rip off" a drug dealer, and who thus would
> have provided crucial corroboration for Stephen
> Fleming's own testimony that he feared York
> because York had spoken ominously of robbing
> drug dealers.**

On May 14, 2002, in an unpublished opinion, the Michigan Court of Appeals

affirmed Petitioner's convictions. *People v. Fleming,* No. 228731, 2002 WL 988568

(Mich. Ct. App. May 14, 2002)(*per curiam*). Petitioner filed for rehearing on both issues,

which was denied by order dated June 20, 2002 with one judge dissenting. Petitioner

filed a "Delayed Application for Leave to Appeal" with the Michigan Supreme Court

raising the same issues he raised before the Michigan Court of Appeals with the addition

of a preservation for review argument because the Michigan Court of Appeals ruled that

the Petitioner failed to preserve his Fifth Amendment claim.  On March 31, 2003,

Petitioner's request for relief was denied.  *People v. Fleming,* 468 Mich. 659; 659 N.W.2d

234 (Table)(Mich. March 31, 2003).

On June 25, 2004, Petitioner filed a "Petition for Writ of Habeas Corpus," which is

presently before the Court, raising the same issues.  In addition, Petitioner stated Issue I

was not procedurally defaulted.

## IV.  <u>Standard of Review</u>

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to
any claim that was adjudicated on the merits in State court proceedings
unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law,
        as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in
        the State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court

factual determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

# V.  Analysis

### A. Whether Petitioner's Claim that his Fifth Amendment Right to Remain Silent and "Right to Cut Off Questioning" was not "Scrupulously Honored" is Procedurally Defaulted.[3]

---

[3]   The Respondent at oral argument acknowledged that the issue was properly raised in the Michigan courts.

Petitioner asserts that his Fifth Amendment[4] issue was addressed at the *Walker*[5] hearing. Therefore, his claim was not forfeited and it is not subject to procedurally default[6] in these proceedings. The Michigan Court of Appeals in its *per curiam* opinion stated that the *Walker* hearing "addressed only the voluntariness of [Petitioner's] confession." *People v. Fleming,* No. 228731, 2002 WL 988568, *1 (Mich. Ct. App. May 14, 2002)(per curiam). Accordingly, it held the *Mosley* claim was forfeited and a plain error analysis of the issue was applied.[7]

The Court disagrees and finds that the "clear record" supports Petitioner's preservation of his *Mosley* claim. See *Walker v. Engle,* 703 F.2d 959, 967 (6th Cir. 1983).

---

[4]*Miranda v. Arizona,* 384 U.S. 436 (1966) (to protect a suspect's Fifth Amendment rights, an individual who has been taken into custody or otherwise deprived of his freedom and is questioned must be advised prior to any questioning, "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him.") *Id.* at 478-79*; Michigan v. Mosley,* 423 U.S. 96 (1975)

[5]*People v. Walker,* 374 Mich. 331; 132 N.W.2d 87 (1965)

[6]The doctrine of procedural default provides: "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

[7]*People v. Carines,* 460 Mich. 750, 763; 597 N.W.2d 130 (1990)

9

The Respondent acknowledged at oral argument the issue had been raised in state court.

Accordingly, the Court finds that Petitioner adequately preserved the issue for appeal, and the Court will review the issue on the merits.

> **B.      Whether Petitioner's  Fifth Amendment Right to Remain Silent and "Right to Cut off Questioning" was "Scrupulously Honored".**

### *1. Admissibility of Petitioner's Confession*

Petitioner invoked his right to remain silent when he told Detective Lesneski on November 19, 1999 during the search of his home that he did not want to talk about the homicide.  Thus, any questioning following the invocation of that right was in complete disregard of his right to remain silent and his "right to cut off questioning." Consequently, any statements obtained after the assertion of his Fifth Amendment[8] right were obtained in an unconstitutional manner and should not have been admitted into evidence.

Law enforcement officers must cease questioning a suspect who invokes his or her right to remain silent or to have an attorney present.  *Miranda v. Arizona,* 384 U.S. at 473-74.  "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends . . .  on whether his 'right to cut off questioning' was 'scrupulously honored."  *Michigan v. Mosley,* 423 U.S. 96, at 104 (1975).

---

[8]The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself.  *U.S. Const. Amend. V.*

Under *Mosley* a court considers several factors when assessing whether officers scrupulously honored a suspect's invocation of his right to remain silent: (1) whether the suspect was advised before the initial interrogation that he had the right to remain silent: he was; (2) whether questioning stopped immediately once the suspect asserted his right to remain silent: it did; (3) whether the police waited a significant period of time after the suspect's invocation of his right to remain silent before questioning him again: not long enough–circumstances concerning search for gun mitigated against length of time; (4) whether the suspect received fresh *Miranda* warnings before the interview leading to his statement: he did not; and (5) whether the final interrogation concerned a crime that was the subject of the first interrogation: it was.

First, the record reflects that Detective Lesneski advised Petitioner of his *Miranda* rights prior to his initial interrogation in Petitioner's home on November 19, 1999. However, Petitioner declined to speak with the detective; and the questioning ceased. Therefore, the first and second prongs of the *Mosley* test have been met. Relative to the third *Mosley* factor, the Court must determine whether the police waited a "significant period of time" after Petitioner first invoked his right to remain silent before questioning him again. Thirty to sixty minutes passed where Petitioner was alone outside in the garage. After narcotics were found on Petitioner's property he was arrested, handcuffed and placed in a van with Officer Clayton, where he sat for an additional two hours.

Once the search uncovered what was believed to be the murder weapon, Officer Clayton told Petitioner to "get with the program," to "do the right thing" and asked the Petitioner if he wanted to speak with Detective Lesneski. Petitioner answered affirmatively. Petitioner had seen the celebration of the officers who found the gun and looked angrily at him. Detective Lesneski did not speak with the Petitioner after his first inquiry about Scott York's death again until approximately three hours later.

A significant period of time between interrogations does not require a durational minimum. Rather under *Mosley,* a significant period of time is a function of the degree to which the police "persist in repeated efforts to wear down [the suspect's] resistence and make him change his mind." *Michigan v. Mosley,* 423 U.S. at 105-06 (considering two hours of no police contact to be a significant period of time); See *United States v. Cody,* 114 F.3d 772, 775-76 (8th Cir. 1997) (holding that three hours was a significant amount of time), see also *United States v. Barone,* 968 F.2d 1378, 1385 (1st Cir. 1992)(holding that more than twenty-four hours was insufficient where police repeatedly pressured the suspect to cooperate).

In this case, Petitioner was forced to wait for a period of three hours between sitting in his garage and in a police van. While waiting, he was physically placed in position to view the police officers search his property and to witness them finding a gun. It is at that point where Officer Clayton began to encourage Petitioner to reveal what he knew about Scott York's death.

Clayton told Petitioner to get with the program and that "maybe he needed to do the right thing." Petitioner responded affirmatively. They sat quietly for a short time–between one and five minutes–then Clayton asked Petitioner if he wanted to speak to Det. Lesneski. Petitioner said yes.

Clayton summoned Lesneski, who within minutes took Clayton's place in the car. Petitioner asked Lesneski whether Lesneski had found the gun; Lesneski answered yes. Petitioner asked Lesneski to move the car out of view of the other police officers, and Lesneski complied. Petitioner then admitted to killing Scott York, and said he expected to spend the rest of his life in prison.

The combination of the police searching and finding the murder weapon and celebrating in front of Petitioner results in the Court's finding that the time elapsed from the exercise of his right to remain silent and the resumption of questioning did not favor the prosecutor.

The fourth prong of the *Mosley* test addresses the issue of whether Petitioner received fresh *Miranda* warnings before his confession. It is undisputed that Petitioner was not read his *Miranda* rights until after he confessed. It is clear in the circumstances the statements of Officer Clayton was interrogation or its equivalent. *Rhode Island v Innis*, 446 US 291 (1980).

> We conclude that the *Miranda* safeguards come into play
> whenever a person in custody is subjected to either express
> questioning or its *functional equivalent*. That is to say, the
> term "interrogation" under *Miranda* refers not only to express

> questioning, *but also to any words or actions on the part of
> the police* (other than those normally attendant to arrest and
> custody) *that the police should know are reasonably likely to
> elicit an incriminating response from the suspect.* The latter
> portion of this definition focuses primarily upon the
> perceptions of the suspect, rather than the intent of the police.
> This focus reflects the fact that the *Miranda* safeguards were
> designed to vest a suspect in custody with an added measure
> of protection against coercive police practices, without regard
> to objective proof of the underlying intent of the police. A
> practice that the police should know is reasonably likely to
> evoke an incriminating response from a suspect thus amounts
> to interrogation.

At 302 (footnotes omitted)(emphasis added).

Respondent asserts that when Detective Lesneski arrived at the van, Petitioner just began talking without the detective initiating any questioning. However, Officer Clayton's interrogation was the genesis of Petitioner talking. Respondent acknowledges that Detective Lesneski waited until Petitioner was done making his statement before reading his *Miranda* rights and beginning his line of questioning.

Respondent asserts that Detective Lesneski's actions were within the permitted conduct of *Mosley* as it was only before Detective Lesneski began his questioning that he read Petitioner his *Miranda* rights. However, the Court finds that the confession came before the reading of Petitioner's *Miranda* rights and was the result of interrogation by Officer Clayton. Therefore, *Mosley* does not permit the statement.

Finally, it is undisputed that the interrogation in question concerned the subject of the first interrogation, thus failing to satisfy the fifth factor of the *Mosley* test. Although,

the mere fact that an interrogation involves the same crime as earlier interrogations, does not automatically require exclusion of the petitioner's statement, *Weeks v. Angelone,* 176 F.3d 249, 268 (4th Cir. 1999), the Court finds exclusion appropriate in light of the above circumstances surrounding Petitioner's confession in this case.

It is important to note that in *Mosley,*

> ...the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

423 U.S. 106 at 327.

The Court concludes that, Petitioner's confession should have been excluded from the evidence. Therefore, the state appellate court's decision resulted in an unreasonable application of federal law as determined by the Supreme Court of the United States.

### 2. Harmless Error Analysis

Where a confession has been erroneously admitted in violation of the defendant's *Miranda* rights, this constitutional error is subject to a harmless error analysis. *Arizona v. Fulminante,* 499 U.S. at 310.

To determine whether the Fifth Amendment error in this case was harmless, the Court will review the five factor test set forth in *Delaware v. Van Arsdall,* 475 U.S. 673 (1986), which are as follows: (1) whether the witness' testimony was important to the prosecution's case; (2) whether the testimony was cumulative; (3) whether the presence

or the absence of the testimony was material; (4) whether there was cross-examination of the witness; and (5) whether the prosecution had a strong case. *Delaware v. Van Arsdall,* 475 U.S. at 684.

Based upon the Court's review of these factors, an assessment must be made about the "prejudicial impact of [the] constitutional error" and "whether the constitutional violation 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Vasquez v. Jones,* 496 F.3d. 564, 575 (6th Cir. 2007), quoting, *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) and *Fry v Piler,* 127 S.Ct. 2321, 2328 (2007).

First, the Court finds that Petitioner's confession was important to the prosecution's case. Petitioner's confession was the strongest evidence as to his guilt. Second, Petitioner's testimony was not cumulative of the other evidence at trial, as there was no other evidence directly linking Petitioner to Mr. York's death. Moreover, Petitioner's confession went to the identification of who was responsible for Mr. York's death and motive behind the killing, which were issues central to the case. There was no evidence contradicting this fact or corroborating the testimony. Therefore, Petitioner's confession standing alone was very powerful evidence. The prosecution's case was not particularly strong without Petitioner's confession. Besides the gun that was found in the stream on Petitioner's open property, there was no physical evidence linking Petitioner to the murder weapon. That is, no finger prints or testimony that it was his gun.

Note, the jury returned a compromise verdict of second degree murder as opposed to the first degree murder charged. See, *Ferensic v Birkett*, __ F3d __, Slip 13 (6th Cir, 9/4/07).

The Court therefore finds that admission of Petitioner's confession was not harmless error, as it prejudicially impacted Petitioner's trial and had a " substantial and injurious effect or influence in determining the jury's verdict." See *Vasquez v. Jones,* 2007 WL 2176985, *7, (6th Cir. (Mich) July 24, 2007). Therefore, habeas relief on this issue is granted.

      **C.**    **Where Stephen Fleming admitted killing Scott York but claimed self defense, the trial court deprived him of his right to present a defense by forbidding him from calling a witness who had seen York "rip off" a drug dealer, and who thus would have provided crucial corroboration for Stephen Fleming's own testimony that he feared York because York had spoken ominously of robbing drug dealers.**

Petitioner claims that he was denied a right to completely present his defense of self defense by the trial court excluding a witness who saw Scott York rob someone a week before he was shot by Petitioner. This testimony would have corroborated his defense of self defense.

Petitioner's Memorandum summarizes as follows:

        Stephen Fleming wanted to call Scott Fowler as a witness for the defense. Fowler had gone with Scott York to Saginaw about a week before the killing, where York had left

Fowler's truck and approached some men to buy crack
cocaine. Fowler saw York get into a "little bit" of a
confrontation with the men, then all of a sudden jump back
into the truck and tell Fowler to "get the fuck out of here"
because he had just "ripped those guys off for some money."

The defense argued that Fowler's testimony was
relevant to show Stephen Fleming's "state of mind", while the
prosecution called it improper character evidence. The trial
judge refused to allow the testimony, but on different
grounds, ruling that it was either irrelevant or so nearly
irrelevant that, under Mich. R. Evid. 403, its prejudicial effect
substantially outweighed its probative value. In the judge's
view, the proposed testimony was "cumulative."

There was no other evidence to corroborate Stephen
Fleming's testimony that Scott York had menacingly referred
to robbing drug dealers. On summation, the prosecution
noted that "the defense case relies entirely on the credibility
of the defendant, Steve Fleming", then launched an attack on
that credibility: "Steve Fleming is about as uncredible [sic] as
a witness could be. His claims at trial are so outrageous that I
would suggest it might have been difficult for any of us to
keep a straight face. . . ." The prosecutor went on to argue
that "Scott York isn't here to defend himself, is he? He is not
here to respond. He can't say what actually happened. . . .
It's real easy to blame it on the dead guy."

Pet. Memo. p. 27-28.

The proffered testimony was the only direct evidence in support of Petitioner's

testimony that he was frightened of Scott York. The prosecutor in his submission to the

jury emphasized the only evidence Petitioner was frightened was his own. He told the

jury,

18

Scott York isn't here to defend himself, is he?  He is not here
to respond.  He can't say what actually happened. . . . It's
really easy to blame a dead guy.

The ruling of the Court of Appeals was:

Defendant also contends that the trial court abused its
discretion by not allowing a witness to testify that the victim
had "ripped off" drug dealers approximately one week before
the victim was murdered.  Defendant asserts that this
testimony would have corroborated his claims he was afraid
of the victim and shot the victim in self-defense.  Initially, we
note that, contrary to defendant's claims, this issue is not a
constitutional issue because defendant was allowed to present
his self-defense claim at trial.  Indeed, defendant had already
testified when the instant evidentiary dispute arose.  Instead,
this is an evidentiary issue that is within the trial court's
discretion and, therefore, reviewed for abuse of discretion.
*People v Carwford*, 458 Mich 376, 383; 582 NW2d 785
(1998).

\*   \*   \*

To assert a self-defense claim, a defendant must
honestly and reasonably believe there is an imminent danger
of serious bodily harm or death.  *People v Heflin*, 434 Mich
482, 502; 456 NW2d 10 (1990).  If evidence is used to show
the defendant's state of mind and support his apprehensions,
the defendant must have known of the evidence.  *People v
Harris*, 458 Mich 310, 317; 583 NW2d 680 (1998).  Here,
defendant's knowledge of the victim's alleged theft from drug
dealers was based on the victim's statements, not the
witness's statements.  In fact, defendant testified that, at the
time of the incident, he did not know anything about the
victim's propensity for violence.  In other words, to whatever
extent defendant had knowledge of the victim's prior conduct,
it was not based whatsoever on the excluded evidence.
Accordingly, we fail to see how the proposed testimony was
relevant to defendant's specific assertion of self-defense.
(Slip Op 3).

This ruling failed to recognize the Constitutional aspect of this error. Thus, it was an unreasonable application of Federal Law.

The recent case of *Ferensic v Birkett*, __ F3d __ *supra*, reviews the Constitutional right to present a defense.

### 1. Right to present a defense

> The right of an accused to present a defense in a criminal trial derives from the Compulsory Process Clause of the Sixth Amendment to the U.S. Constitution, and "stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). In fact, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 408 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). In *Taylor*, the Supreme Court explained the origins and nature of the right as follows:

> The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it

did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words: "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."

484 U.S. at 409 (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)). At 6.

The exclusion of this testimony was not harmless. It allowed the prosecutor to argue Petitioner's testimony of fear of Scott York was not corroborated.

The fact Petitioner was able to tell the jury he acted in self-defense did not present the full weight of the defense.

The failure of the state Court of Appeals to recognize the Constitutional dimension of the error was an unreasonable application of federal law.

Therefore, habeas corpus relief is granted on this issue.

**VI. Conclusion**

For the foregoing reasons, Petitioner's claim for habeas relief is conditionally granted based on both issues.

IT IS HEREBY ORDERED that the Petition for Writ of Habeas Corpus **[Doc. #1, filed June 25, 2004]** is **GRANTED.** The State is **ORDERED** to release Petitioner unless it retries him within ninety days of the date of this order.

s/Arthur J. Tarnow
UNITED STATES DISTRICT UDGE

DATE:      September 28, 2007

| Certificate of Service |
|---|
| The undersigned certifies that a copy of the foregoing Order was served on the attorneys and/or parties of record herein by electronic means and/or First Class U.S. Mail on **September 28, 2007**. |
| s/Kim Grimes |
| Deputy Clerk |